7 F.3d 225
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
PALMETTO FORD, INCORPORATED, Plaintiff-Appellant,
v.
FIRST SOUTHERN INSURANCE COMPANY, Defendant-Appellee.
 No. 92-2350.
 United States Court of Appeals,
Fourth Circuit.
 Argued: July 15, 1993.
Decided: September 22, 1993.
 
 Appeal from the United States District Court for the District of South Carolina, at Charleston.
 Stephen Peterson Groves, Sr., Joseph Rutledge Young, Jr., YOUNG, CLEMENT, RIVERS & TISDALE, for Appellant.
 Ruskin C. Foster, MCKAY, MCKAY, HENRY & FOSTER, P.A., for Appellee.
 Amy R. Jordan, YOUNG, CLEMENT, RIVERS & TISDALE, for Appellant.
 Glenn V. Ohanesian, MCKAY, MCKAY, HENRY & FOSTER, P.A., for Appellee.
 D.S.C.
 AFFIRMED.
 Before ERVIN, Chief Judge, and PHILLIPS and MURNAGHAN, Circuit Judges.
 ERVIN, Chief Judge:
 
 OPINION
 
 1
 Palmetto Ford ("Palmetto") appeals the district court's granting of First Southern Insurance Company's ("First Southern") motion for summary judgment. The district court held that under the terms of the comprehensive general liability insurance policy ("Policy") First Southern had issued to Palmetto, First Southern did not have a duty to defend Palmetto in another lawsuit. Palmetto raises three issues on appeal: whether the district court erred (1) in holding that Palmetto was bound by the Policy's exclusions found in a form referenced in the Policy, but not given to Palmetto; (2) in granting summary judgment to First Southern on Palmetto's bad faith cause of action; and (3) in denying Palmetto's motion for partial summary judgment. For the reasons stated below, we affirm the decision of the district court.
 
 
 2
 * On March 1, 1990, Palmetto purchased a comprehensive general liability insurance policy from First Southern which it marketed for automobile dealerships. The Policy covered numerous potential grounds for liability including: building and personal property, legal liability, business income, extra expense and commercial general liability coverage. It provided $2,000,000 in commercial general liability coverage and $1,000,000 in personal and advertising coverage.
 
 
 3
 The Policy's Statement of Declarations ("Declarations") contained a reference to exclusions and limitations of coverage in the Policy.
 
 
 4
 These exclusions were listed on forms separate from the Declarations. Form CG 0104 (11/85) ("Form CG 85") was among the separate forms which listed specific duties and exclusions. This form stated that First Southern had a duty to defend the insured, but provided limitations on that coverage for allegations of violations of the penal code. Form CG 85 stated
 
 
 5
 [w]e will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this coverage part applies. We will have the right and duty to defend any "suit" seeking those damages.
 
 
 6
 It provided that the insured was covered for " 'personal injury' caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you." The form, however, defined "personal injury" or "advertising injury" so as to exclude injuries
 
 
 7
 (1) arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity; ... (3) arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured. (emphasis added).
 
 
 8
 On February 26, 1991, a former Palmetto employee, L. Nathan Mundy, sued Palmetto for wrongful termination, defamation, and discrimination. L. Nathan Mundy v. Palmetto Ford Inc., No. 92-1041, slip op. (4th Cir. July 27, 1993) (We affirmed the district court's granting of Palmetto Ford's motion for summary judgment). Mundy alleged that Palmetto employees made defamatory allegations about him engaging in drug use. In his complaint, Mundy averred that the defamatory statements were
 
 
 9
 made by [Palmetto Ford's] agents with actual malice and with wrongful, reckless and willful intent to injure[Mr. Mundy] when they knew that the statements were false.... Said Publications did convey, to [Mr. Mundy's] co-workers and to the community at large the impression that[Mr. Mundy ]was a drug addict who was not a good and honorable employee, and they were calculated to, and did, hold [Mr. Mundy] up to public scorn, hatred, and ridicule.
 
 
 10
 Palmetto presented First Southern with Mundy's complaint and requested that, pursuant to the Policy, First Southern defend the suit. First Southern declined to defend Palmetto on the ground that Mundy's allegations fell outside the scope of the Policy. It stated that the suit was excluded from coverage because Mundy alleged that the defamation was intentional.
 
 
 11
 Subsequently, Mundy amended his complaint on July 5, 1991. In his amended complaint, Mundy alleged that Palmetto's agent's defamatory statements were
 
 
 12
 the result of the negligent, reckless, willful and wanton defamatory statements made by Sam Lyons, an employee of [Palmetto Ford].... Sam Lyons was negligent, reckless, willful and wanton in making these defamatory statements without determining the truth or veracity of such statements.
 
 
 13
 Palmetto presented the amended complaint to First Southern; it again denied coverage and refused to defend Palmetto in the Mundy action. First Southern concluded that the amended complaint did not sufficiently allege negligent conduct because the underlying allegations were the same as in the original complaint. Palmetto then retained its own counsel to defend the Mundy action.
 
 
 14
 Palmetto initiated this declaratory judgment action against First Southern to determine coverage under the Policy. It also alleged a breach of contract. Furthermore, Palmetto contended that First Southern's failure to defend the Mundy action was in bad faith.
 
 
 15
 Palmetto moved for partial summary judgment. On May 22, 1992, during a hearing on the summary judgment motion, First Southern disclosed the portion of the Policy upon which it had relied in denying coverage. It based its denial of coverage on Form CG 85. Palmetto claimed that it neither received a copy of Form CG 85 nor knew of its existence prior to the hearing. Palmetto asserted that it could not be bound by the provisions found in Form CG 85 since it never received a copy of the form.
 
 
 16
 On July 28, 1992, the district court denied Palmetto's motion for partial summary judgment. It held that First Southern did not have a duty to defend Palmetto against Mundy's amended complaint because Form CG 85 excluded the causes of action Mundy alleged. The district court found that Form CG 85's exclusion for willful violations of the penal code was applicable because if Mundy's allegations were true, they would constitute a violation of South Carolina's defamation statute.
 
 
 17
 First Southern moved for summary judgment on the three causes of action raised by Palmetto. Palmetto also made a motion to the district court to alter or amend its July 28, 1992 order. It asserted that the district court should find that Form CG 85 was newly discovered evidence.
 
 
 18
 On September 25 the district court granted First Southern's motion for summary judgment on all three causes of action. It reiterated that under the terms of the Policy First Southern had no duty to defend Palmetto. The court based its decision on the Policy's exclusion for injuries "[a]rising out of the willful violation of a penal statute or ordinance...." It granted First Southern's motion for summary judgment on Palmetto's breach of contract claim finding that there was no breach. Furthermore, the district court found that there was no bad faith on the part of First Southern as it had no duty to defend Palmetto. The district court denied Palmetto's motion to alter or amend its prior findings. This appeal ensued.
 
 II
 
 19
 * The first issue is whether Palmetto is bound by the exclusions listed in Form CG 85 of the Policy. Palmetto did not have actual notice of the exclusions contained in Form CG 85 because it did not possess a copy of it. We must determine whether Palmetto was deemed to have constructive notice of the restrictions because Form CG 85 was referenced in the Policy's Declarations.
 
 
 20
 The South Carolina Supreme Court made a sweeping pronouncement regarding when a person is deemed to have notice of facts in Multi Media Publishing, S.C. v. Mullins, et al., No. 23860 S.C. Lexis 106, at * 4 (S.C. May 17, 1993). In Mullins, a breach of contract case, the court held that a corporation's veil had been pierced properly. The court stated that
 
 
 21
 [i]t is settled law in South Carolina that when a person has notice of facts as are sufficient to put him on inquiry, and those facts, if pursued with due diligence, would lead to knowledge of other facts, he must be presumed to have knowledge of the undisclosed facts. Norris v. Greenville S. & A. R. Co., 111 S.C. 322, 330, 97 S.E. 848, 850 (1919).
 
 
 22
 1993 S.C. Lexis 106 at * 5. This duty places a significant obligation on a party who has had information partially disclosed to him to discover any undisclosed facts. The party to whom the partial disclosure was made must conduct a reasonable investigation to ascertain all relevant facts, otherwise those undiscovered facts will be imputed to him.
 
 
 23
 In the instant matter, the Policy's Declarations stated:
 
 
 24
 Item 3: Other forms and endorsements applying to this coverage part and made a part of this policy at time of issue: S.C. Changes-Exclusion-Alcoholic Beverages CG 0104(11/85) [Form CG 85] included.
 
 
 25
 This statement placed Palmetto on notice that there were some exclusions in the coverage not listed in that portion of the Policy, but contained in accompanying forms. The exclusions listed on Form CG 85 are very explicit. Form CG 85 states
 
 
 26
 [t]his insurance does not apply to: personal injury or advertising injury ... arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured.
 
 
 27
 Under South Carolina law, Palmetto was deemed to have knowledge of the above section because the Policy's Declarations placed Palmetto on notice of Form CG 85. Mullins required Palmetto to conduct a reasonable investigation to ascertain the facts. Palmetto neither requested a copy of Form CG 85 nor did it make any inquiry at all into the contents of Form CG 85 prior to the hearing. Palmetto concedes that it was given notice that other exclusions applied, but not given the actual list of exclusions. Moreover, there is no evidence that First Southern was either attempting to deceive or commit fraud against Palmetto. Therefore, Palmetto is deemed to have constructive knowledge of Form CG 85 and its contents. Finding that Palmetto is bound by the exclusions listed in Form CG 85, however, does not end the inquiry.
 
 
 28
 The district court held that there was no coverage because of the Policy's exclusion of coverage for violations of the penal code, specifically S.C. Code Ann. § 16-7-150 (Law. Co-op. 1976). Section 167-150 provides that
 
 
 29
 [a]ny person who shall with malicious intent originate, utter, circulate or publish any false statement or matter concerning another the effect of which shall tend to injure such person in his character or reputation shall be guilty of a misdemeanor....
 
 
 30
 Id. The allegations in Mundy's complaint, if true, would clearly constitute a violation of this statute. Therefore, the district court determined that the penal statute exclusion applied and First Southern did not have a duty to defend.
 
 
 31
 Unbeknownst to the district court, section 16-7-150 had been declared unconstitutional.[1] Fitts v. Kolb, 779 F. Supp. 1502, 1519 (D.S.C. 1991). Fitts arose due to the prosecution of a newspaper reporter under section 16-7-150. Fitts was charged with defamation under this statute because of an article he wrote in which Fitts allegedly defamed two local politicians. He then initiated a declaratory action seeking to have the statute declared unconstitutional. The Fitts court held that the
 
 
 32
 South Carolina criminal libel statute, S.C. Code Ann. § 167-150 (Law. Co-op. 1976), as presently drafted, is overbroad and vague in violation of the First and Fourteenth Amendments to the United States Constitution.
 
 
 33
 Id. The court determined that the statute was so overly broad that an ordinary citizen could not determine what conduct was prohibited and what conduct was permitted. Id. at 1516. It found that the statute's use of the term "malicious" did not comport with and could create confusion with the term "malice" as used in New York Times Co. v. Sullivan, 376 U.S. 254 (1964). Id. at 1515. No appeal was taken in the case. South Carolina neither amended its defamation statute to narrow it nor did South Carolina repeal the statute in light of Fitts. Therefore, the district court's basis for finding that First Southern did not have a duty to defend Palmetto, the penal statute exclusion, may be jeopardized.
 
 
 34
 The critical question is whether to apply the holding in Fitts either retroactively or nonretroactively to the instant matter. A nonretroactive application of Fitts would mean that it would have no bearing on the outcome of this case. The test created for civil cases is the most appropriate test to employ for this nonretroactivity question because the instant case is a civil action not involving the criminal application of section 16-7-150.
 
 
 35
 In deciding retroactivity questions we have noted that the "general rule is to apply such decisions [civil] retroactively." Sargent v. Sullivan, No. 90-1521, slip op. at 6 (4th Cir. August 22, 1991). In certain instances the doctrine of nonretroactivity is applicable. The Supreme Court established the factors to be considered in determining the nonretroactivity of judicial decisions in Chevron Oil Co. v. Huson, 404 U.S. 97 (1971).[2]
 
 
 36
 The Chevron Court held that a state statute of limitations should not apply because retroactive application of the statute of limitations would unfairly penalize petitioner Huson. The Court noted that the cause of action arose three years before the subsequent judicial determination altering the law. The effect of retroactive application would have been to deny Huson any remedy. It stated "we have recognized the doctrine of nonretroactivity outside the criminal area many times, in both constitutional and nonconstitutional cases." Id. at 106. The Court then created a three part test to decide the nonretroactivity question. It opined
 
 
 37
 [i]n our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which the litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that 'we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity."
 
 
 38
 Id. at 106-107. (citations omitted).
 
 
 39
 In Grimes v. Owens-Corning Fiberglass Corp. 843 F.2d 815 (4th Cir.), cert denied, 488 U.S. 889 (1988) we held that an intervening judicial decision should be applied nonretroactively. This court noted that the first Chevron factor was the initial and most important factor to be considered. Id. at 819. We stated that the three interrelated factors "need not be fully satisfied in order to preclude retroactivity." Id. The three factors should be balanced against one another.
 
 
 40
 The first Chevron factor is whether clear circuit precedent on which the complaining party could have relied was overturned or whether the court decided an issue of first impression. In the instant matter, this factor favors First Southern. The Fitts case appears to be the first instance in which the South Carolina defamation statute had been challenged in federal court. First Southern had no way of predicting at the time it entered into the insurance contract with Palmetto that section 16-7-150 either would be challenged or declared unconstitutional.
 
 
 41
 Moreover, the sequence of events prior to Fitts favors nonretroactive application of that decision. Palmetto purchased the Policy in March 1990. First Southern denied Palmetto coverage on the Mundy claims initially in March 1991 and again in July 1991. Palmetto's action against First Southern was filed on October 4, 1991. Both of the denials of coverage and the commencement of this action occurred prior to the Fitts decision which was issued in November 1991. First Southern rightfully denied coverage based upon the then valid penal statute.
 
 
 42
 The second Chevron factor requires us to"weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." Chevron, 404 U.S. at 106. In the instant matter this factor is neutral. Fitts concerned the constitutionality of the South Carolina defamation statute and the court's primary interest was the statute's effect on First and Fourteenth Amendment rights. In contrast, this issue has no constitutional implications, but is a contractual matter. Nonretroactive application of Fitts would place the parties in the position they were in when they entered into the insurance contract.
 
 
 43
 The final Chevron factor is whether retroactive application of the judicial decision would produce inequitable results. The Chevron Court noted that its precedent provided "ample basis ... for avoiding the 'injustice or hardship' by a holding of nonretroactivity." Id. at 107. This factor weighs in favor of First Southern. First Southern and Palmetto entered into the Policy on the basis of certain expectations and assumptions. In determining the Policy's premium, First Southern calculated in the value of not having to defend this type of lawsuit. Retroactively applying Fitts to this case would give Palmetto a windfall because its premiums reflected the Policy's exclusion of this type of liability. Likewise, it would be detrimental to First Southern, who rightfully relied on the South Carolina statute when drafting the Policy, setting the premium and later denying coverage.
 
 
 44
 Based upon the factors enunciated in Chevron, the Fitts decision should not be applied retroactively in the instant matter. Although the penal statute upon which First Southern relied is no longer valid, at the time First Southern issued the Policy and denied coverage section 16-7-150 was in effect. Mullins provides that Palmetto was deemed to have constructive notice of Form CG 85 and its penal statute exclusion. Therefore, the district court did not err in granting First Southern's motion for summary judgment.
 
 B
 
 45
 Next, Palmetto contends that the district court erred in granting summary judgment to First Southern on its claim of bad faith in refusing to defend the Mundy action. Palmetto asserts that First Southern denied its claim in bad faith because there was not a legitimate reason for First Southern to deny coverage.
 
 
 46
 The South Carolina Supreme Court listed the elements of a cause of action for bad faith refusal to pay benefits under an insurance contract in Crossley v. State Farm Mutual Automobile Ins. Co., 415 S.E.2d 393, 396-397 (S.C. 1992). The court held that
 
 
 47
 [t]he elements of a cause of action for bad faith refusal to pay first party benefits under a contract of insurance are: (1) the existence of a mutually binding contract of insurance between the plaintiff and the defendant; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing arising on the contract; (4) causing damage to the insured. Id.
 
 
 48
 In the instant case the first, second, and fourth elements are fully satisfied. As to the third element, First Southern's actions were in no way an exercise of bad faith. First Southern's actions were based on a reasonable interpretation of the terms of the Policy. Form CG 85 contained a provision relieving First Southern of its duty to defend actions which would constitute a violation of a penal statute. First Southern based its refusal to defend on an exclusion in the Policy which was valid at the time. No bad faith can be demonstrated or imputed from First Southern's course of conduct.
 
 C
 
 49
 Having found that the district court properly granted summary judgment to First Southern on all issues, we need not address Palmetto's remaining assignment of error.
 
 III
 
 50
 The district court properly granted summary judgment to First Southern. The Policy between First Southern and Palmetto provided an exclusion of coverage for violations of a penal statute. Therefore, the decision of the district court is
 
 
 51
 AFFIRMED.
 
 
 
 [1]
 This was also unbeknownst to counsel for both parties as well. This issue arose sua sponte. We discovered that section 16-7-150 had been declared unconstitutional prior to oral argument. At oral argument, we requested that both sides brief the effect of Fitts on this matter
 
 
 [2]
 We note that the utility of the Chevron analysis may have been limited by the Supreme Court in some cases by its decision in James B. Beam Distilling Co. v. Georgia, 59 U.S.L.W. 4735 (U.S. June 20, 1991). This limitation does not affect this case because Beam was decided on narrow grounds "confined entirely to an issue of choice of law...." Id. at 4739